IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

DANTRILLE STARKE,
o/b/o KBJ,

              Plaintiff,

v.                                       Case No.  1:15-cv-228-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,

              Defendant.

_____/

## REPORT AND RECOMMENDATION

Dantrille Starke, on behalf of her minor child, appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying her application for childhood Supplemental Security Income ("SSI") disability benefits. (ECF No. 1.) The Commissioner has answered (ECF No. 10), and both parties have filed briefs outlining their respective positions. (ECF Nos. 20–21.)  For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

## I.  BACKGROUND

Dantrille Starke, on behalf of her minor child, KBJ, protectively filed an application for children's SSI benefits on July 28, 2008, alleging

disability since KBJ's birth on March 28, 2008. (R. 110–16, 127.) Plaintiff's[1]

application was denied initially and on reconsideration. (R. 60–68.) After a

hearing on February 16, 2011, an administrative law judge ("ALJ") found

Plaintiff not disabled. (R. 11–30, 36–57.) The Appeals Council denied

Plaintiff's request for review (R. 1–4.)

Plaintiff subsequently filed an action in this Court. *See Starke o/b/o*

*K.B.J. v. Comm'r of Soc. Sec.*, No. 1:12-cv-59-GRJ, ECF No. 1 (N.D. Fla.

Apr. 10, 2013). Upon review, the Court concluded that the ALJ erred in

failing to consider and evaluate Plaintiff's standardized tests. *Id.*, ECF No.

15–16. The Court therefore reversed and remanded the decision of the

Commissioner under sentence four of 42 U.S.C. § 405(g), so the ALJ could

conduct further administrative proceedings. *Id.*

Accordingly, on July 16, 2013, the Appeals Council vacated the ALJ's

earlier decision and remanded the case to the ALJ for further proceedings.

(R. 612–15.) The Appeals Council also noted that Plaintiff had filed a

subsequent application on November 19, 2012. (R. 614.) Based on the

subsequent application the state agency found Plaintiff disabled beginning

November 1, 2012. (*Id.*) The Appeals Council reviewed the evidence

---

[1] Even though this action is being brought by the mother on behalf of her minor child, the Court will refer to the minor child as the Plaintiff.

considered with the subsequent claim, concluded that the subsequent claim was supported by substantial evidence, and affirmed the finding of disability beginning November 1, 2012. (*Id.*) Thus, the Appeals Council instructed the ALJ to determine on remand whether Plaintiff was disabled prior to November 1, 2012. (*Id.*)

The ALJ held a supplemental hearing on January 16, 2015. (R. 554–76.) Following the hearing, on July 22, 2015, the ALJ found Plaintiff not disabled from July 28, 2008 through October 31, 2012. (R. 515–52.) Plaintiff did not file any exceptions and the Appeals Council, therefore, did not review the ALJ's decision. Plaintiff filed the instant action on October 19, 2015. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2015). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971));

*accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human*

*Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law considers a child disabled, for the purposes of children's SSI benefits, if that child has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I) (2015). However, no child who "engages in substantial gainful activity . . . may be considered to be disabled." § 1382c(a)(3)(C)(ii). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." § 1382c(a)(3)(D).

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments.§ 1382c(a)(3)(G). In determining the disability of a child, the Commissioner must make reasonable efforts to ensure that a qualified pediatrician or other specialist evaluates the case. § 1382c(a)(3)(I).

The Commissioner has promulgated regulations governing eligibility for SSI benefits. *See* 20 C.F.R. Pt. 416, Subpt I (2015); *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). In accordance with

Congressional intent, the regulations define "marked and severe functional limitations" as "a level of severity that meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.902 (2015).

The regulations set forth a three-part sequential test the Commissioner must follow when determining disability in children. 20 C.F.R. § 416.924(a) (2015). First, a child must show that the child is not performing substantial gainful activity. § 416.924(b). Second, if the child is not working, the child must show that the child suffers from an impairment or combination of impairments that is severe. § 416.924(c). Third, if there are severe impairments, the child must show that the child's impairments meet, medically equal, or functionally equal the severity of an impairment in the listings. § 416.924(d). If the child does not meet all three criteria then the child is not disabled. In addition, the Commissioner must find that the child's impairment meets the duration requirement, which means the impairment must be expected to result in death or to last longer than 12 months. If the child meets all three criteria and the duration requirement, then the child is disabled. § 416.924(d)(1).

Provisions for determining functional equivalence are established under 20 C.F.R. § 416.926a (2015). Stated generally, to functionally equal

a listed impairment, a child must demonstrate an "extreme" limitation in one domain of functioning, or show a "marked" limitation in two domains of functioning. § 416.926a(a). There are six domains of functioning to be considered: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. § 416.926a(b)(1). A "marked" limitation in a domain means that the child's impairment "interferes seriously with [his or her] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(2). An "extreme" limitation in a domain means that the child's impairment "interferes very seriously with [his or her] ability to independently initiate, sustain, or complete activities." § 416.926a(e)(3).

## III.  SUMMARY OF THE RECORD

### A.  Physical Medical History

Plaintiff was born premature at 28 weeks on March 28, 2008, via an induced C-Section. Plaintiff required resuscitation upon birth due to a knotted umbilical cord. (R. 228.) At the time of his birth, his mother also had HIV/AIDS, disseminated cryptococcal sepsis, and meningitis. (R. 228, 235.) After birth, Plaintiff remained in the neonatal intensive care unit

("NICU") with respiratory distress syndrome ("RDS") and elevated liver enzymes. (R. 230, 235.) Despite being exposed to intrauterine HIV, Plaintiff's HIV tests were negative. (R. 242.) On May 9, 2008, Plaintiff passed an auditory brainstem response ("ABR") test. (R. 232.) An MRI of Plaintiff's brain on June 10, 2008 revealed findings consistent with leukoencephalopathy of prematurity with expected evolution of intraventricular blood products. (R. 189, 304.) Plaintiff was released from the NICU on June 13, 2008. (R. 230, 235.)

Ms. Starke did not report any problems at Plaintiff's two-month well child exam on June 19, 2008. Other than an umbilical hernia from birth, Plaintiff's physical exam was normal. Lab work, however, revealed that Plaintiff had cholestasis. (R. 217.) At his four-month well child exam on July 22, 2008, Ms. Starke reported that Plaintiff was shaking for approximately one minute several times per day since he had been in the NICU. Plaintiff's umbilical hernia had also gotten larger. Physical examination revealed normal findings except for transmitted upper airway sounds in Plaintiff's lungs, a large umbilical hernia, uncircumcised genitalia, and dry skin. The report noted that Plaintiff needed an EEG for suspicion of seizure. (R. 218.) The EEG, which was later performed on

August 18, 2008, did not reveal any categorical epileptiform activity. The findings, however, did not rule out seizure disorder. (R. 316.)

On August 20, 2008, Plaintiff was examined in the Pediatric Liver Clinic ("PLC") at Shands for elevated liver enzymes and direct hyperbilirubinemia. Ms. Starke reported that Plaintiff was doing well, eating well, and gaining weight. She did not have any specific concerns about Plaintiff. Physical examination revealed clear lungs with good air movement, a reducible large umbilical hernia, soft but distended abdomen, enlarged but palpable liver, normal skin, and no edema in the extremities. Musculoskeletal and neurological exams were normal. (R. 320–22.) An abdomen ultrasound and biliary scan on August 28, 2008, also revealed a normal liver, spleen, gallbladder, kidneys, bladder, and hepatic vessels. (R. 360.) The biliary scan revealed slight decreased clearance from the liver consistent with recovering neonatal viral hepatitis. (R. 362.)

Plaintiff returned to the PLC for follow-up on September 17, 2008. Ms. Starke reported that Plaintiff had been doing well since his previous visit and had no liver-related symptoms. Physical examination revealed that Plaintiff was "thriving," had no icterus or any other sign of chronic liver

disease. Allah Haafiz, M.D., opined that Plaintiff's cholestasis was "slowly resolving both on clinical and biochemical grounds." (R. 323.)

Plaintiff presented to the Pediatric Surgery Clinic at Shands on November 18, 2008, for evaluation of a possible inguinal hernia. Examination, however, revealed a large umbilical hernia that did not warrant surgical intervention at that time. (R. 392.)

At Plaintiff's six-month well child exam on November 25, 2008, Ms. Starke reported that Plaintiff's cholestasis was improving and that his seizure activity was much improved. The last spasm-like episode Plaintiff experienced was the weekend before the visit for approximately ten seconds, after which Plaintiff was responsive and acted like himself. Physical examination was normal other than the umbilical hernia, which appeared smaller. (R. 219.)

Plaintiff returned to the PLC for a follow-up on January 28, 2009. His mother reported that he had done well since his last visit and had not had any liver-related problems. Examination revealed normal findings except for diffuse scattered pulmonary wheezing, for which Plaintiff was using a nebulizer. (R. 394.) An X-ray of Plaintiff's chest later revealed perihilar peribronchial thickening. (R. 396.)

Plaintiff still had wheezing and coughing at his nine-month well child exam in February 2009. Ms. Starke reported, however, that Plaintiff had no body shaking since the past week. Physical examination was normal other than an abnormal head shape consistent with prematurity, mild nasal drainage, wheezing in the lungs, and a minor skin irritation on Plaintiff's neck. (R. 220.) Plaintiff's twelve-month well child exam on April 7, 2009 was also largely normal except for a small reducible umbilical hernia and minor skin issues. (R. 221.)

Plaintiff returned to the PLC on July 15, 2009, for a follow-up visit with Dr. Haafiz. Ms. Starke reported that Plaintiff had no liver-related symptoms since his last visit with the PLC. At the time, Plaintiff was taking ursodiol, ADEK vitamins, Flovent, and loratadine. Physical examination was normal and there was no intermittent history of any symptom to indicate ongoing liver inflammation. Dr. Haafiz opined that Plaintiff's cholestasis "appears to have resolved." Accordingly, Dr. Haafiz discontinued the ursodiol and ADEK vitamins. (R. 843.)

Plaintiff's fifteen-month well child exam in July 2009 also revealed largely normal physical examination findings. Ms. Starke reported, however, that Plaintiff had a wobbly gait in the mornings. Accordingly,

Plaintiff was referred to the pediatric surgery department for assessment of a possible inguinal hernia, to physical therapy for his wobbly gait, and to the audiology department for a hearing evaluation. (R. 512.) Plaintiff was also prescribed an aerochamber for asthma. (R. 512–13.)

Plaintiff began physical therapy at Kids on the Move in August 2009. Evaluation revealed flat feet, internal tibial torsion, tibial bowing, and bilateral forefoot adduction. Orthotics were ordered for Plaintiff. (R. 926.) Plaintiff returned to Kids on the Move in September 2009 to have the orthotics fit. Ms. Starke was advised to contact Kids on the Move when Plaintiff began outgrowing the orthotics. (R. 933.)

Plaintiff had a hearing evaluation with the Department of Communicative Disorders in September 2009. Testing revealed normal middle ear function in the left ear but a noncompliant tympanic membrane with normal ear canal volume in the right ear, indicative of possible middle ear pathology. Soundfield testing using visual reinforcement revealed minimal responses outside of normal limits for Plaintiff's age. The audiologist recommended that Plaintiff be evaluated by his pediatrician for possible right middle ear pathology. (R. 488.)

Plaintiff's physical examination at his eighteen-month well child exam on October 20, 2009, was normal except for his umbilical hernia, which appeared to have improved. (R. 511.) On October 26, 2009, however, Plaintiff underwent surgery for bilateral inguinal hernias, a tethered left testicle, and phimosis. (R. 478–79.) His follow-up visit with the Pediatric Surgery Department in November 2009 was largely unremarkable. The inguinal and scrotal incisions were well-healed with no evidence of recurrent hernia. Other than a somewhat high left testicle, Plaintiff was "doing well." The report recommended continued observation. (R. 834.)

Plaintiff returned to Kids on the Move in February 2010 for a physical therapy re-evaluation. Plaintiff could go up and down steps alternating feet with the use of a railing, run on level surfaces, and walk backward 5–10 steps. He could also elevate on toes to reach overhead and kick a stationary ball with either foot. His in-toeing appeared decreased compared to his initial evaluation in August 2009. His tibial torsion and bowing also appeared improved. Plaintiff's flat footedness and forefoot adduction, however, persisted. Plaintiff had outgrown his orthotics so new ones were ordered. (R. 928, 933.) In May 2010, however, after repeated attempts to

deliver the new orthotics, Plaintiff was discontinued from the program due to lack of response. (R. 933.)

At Plaintiff's two-year well child visit in June 2010, Plaintiff's mother reported that Plaintiff's asthma was controlled and that he had not needed albuterol in the last several weeks. She admitted, however, to poor compliance with the mask/aerochamber Flovent because Plaintiff had trouble keeping it on his face during treatments. Thus, she had been using it without the chamber. She also reported trouble with the albuterol and requested a nebulizer machine. Plaintiff's allergies and constipation were controlled with medications. Plaintiff also had no shaking episodes in the past month. Although Plaintiff was referred for a sleep study for snoring, Ms. Starke admitted that she has not yet taken him due to transportation issues. Ms. Starke also reported no issues following Plaintiff's inguinal hernia repair. Although Plaintiff was assessed with a "healthy exam," Ms. Starke was instructed to increase compliance with the aerochamber/mask Flovent. (R. 503–06.)

At Plaintiff's follow-up visit with the PLC on July 7, 2010, Ms. Starke reported Plaintiff had done well since he was last seen in the PLC and did not have any liver-related problems. The only medications Plaintiff was still

taking were Flovent and loratadine. Physical examination was normal.

Regino Gonzalez-Peralta, M.D., opined that Plaintiff's "cholestasis appears

resolved." (R. 450.)

Plaintiff returned to the UF Pediatrics Department on October 12,

2010. Although Ms. Starke stated she was still giving Plaintiff flovent

without a spacer, Plaintiff had not needed albuterol since August. The

doctor advised that using flovent without a spacer does no good. (R.

499–500.) Five days later, Plaintiff reported to the Emergency Department

at Shands for difficulty breathing. Plaintiff had received a flu shot several

days earlier and started to have cough, congestion, a runny nose, and a

low grade temperature. Plaintiff was diagnosed with an upper respiratory

infection from the common cold and asthma exacerbation. Plaintiff was

prescribed a nebulizer machine, albuterol, and orapred and subsequently

discharged. (R. 463–72.)

On September 20, 2010, Plaintiff was evaluated by Emily Tuttle-

McClain, Au.D., CCC-A, in the Department of Speech, Language, and

Hearing Sciences at Shands Rehab for Kids ("Shands Rehab"). Ms. Starke

reported that Plaintiff responded very well at home, that she was not

concerned about Plaintiff's hearing, and felt like Plaintiff was starting to

produce speech and language. Testing revealed normal middle ear pressure and compliance bilaterally, indicative of normal middle ear function. Soundfield testing revealed minimal response levels within normal limits for Plaintiff's age. Plaintiff also demonstrated "excellent localization abilities." (R. 474.)

Plaintiff's physical examination in November 2010 at his 30-month well child exam was normal. (R. 494–98.) Similarly, his three-year well child exam in March 2011 also revealed largely normal physical findings, except for an ear infection. Ms. Starke also reported that Plaintiff recently had wheezing, upper respiratory infection symptoms, and a fever, for which he received albuterol treatment. (R. 968–72.)

A year later, at his four-year well child exam in April 2012, Ms. Starke reported that Plaintiff was still taking Zyrtec, Albuterol, and Flovent and had no issues with his asthma or allergic rhinitis. Physical examination, however, revealed ankyloglossia and Plaintiff was unable to raise his tongue to the roof of his mouth. Other than abnormal marks for teeth due to cavities, Plaintiff received normal marks on all other physical examination aspects. (R. 953–57.)

Plaintiff returned to Kids on the Move in July 2012 for balance deficits, mixed skills delay, asymmetry of the trunk, flat footedness, and leg length discrepancy. The physical therapist determined that Plaintiff needed stretching, strengthening, facilitation of motor planning, facilitation of balance in stance, and orthotics. Plaintiff was to undergo physical therapy once per week for six months. The therapist opined that Plaintiff had good rehab potential for his balance and coordination issues. (R. 929–31.)

On August 7, 2012, Rodrigo Silva, M.D., evaluated Plaintiff in the Otolaryngology department at Shands and diagnosed Plaintiff with ankyloglossia. Plaintiff underwent surgery later that month. Plaintiff did well after surgery with no pain. He also demonstrated some improvement in speech and was able to stick his tongue out further. (R. 898–921.) A follow-up visit with Dr. Silva on August 27, 2012 revealed the same findings. (R. 898.) (R. 941–43.)

At a follow-up visit with the UF Pediatrics Department in October 2012, Ms. Starke reported that Plaintiff had been doing well. Physical examination revealed normal findings. (R. 941–43.) Plaintiff was subsequently deemed disabled beginning November 1, 2012. (R. 614.)

**B.  Developmental Medical History**

Ms. Starke completed a "Birth to 1st Birthday" Function Report for Plaintiff on August 6, 2008. She reported that Plaintiff had no problems seeing or hearing. Plaintiff's activities and abilities were, however, limited. Nonetheless, Plaintiff made various cooing sounds, stopped crying when picked up, watched the face of the person talking to him, and played games like "peek-a-boo." Ms. Starke stated that Plaintiff "smiles when great grandmother plays pat a cake." He also turned his head in the direction of familiar noises or voices, turned his head when his name was called, and smiled at faces he knew. He cuddled in arms when held and rolled from his stomach to back. (R. 122–26.)

A Battelle Developmental Inventory was then completed for Plaintiff on September 12, 2008 ("First BDI").[2] The First BDI was not signed by an examiner. Although it noted that Plaintiff's chronological age was 5 months and 14 days, his corrected age was 2 months and 20 days. The First BDI disclosed that Plaintiff was functioning in the two months range with

---

[2] "The Battelle Developmental Inventory . . . is an early childhood instrument based on the concept of developmental milestones. As a child develops, he or she typically attains critical skills and behaviors sequentially, from simple to complex. [The Battelle Developmental Inventory] helps measure a child's progress along this developmental continuum by both global domains and discrete skills sets in the following areas: Adaptive, Personal-Social, Communication, Motor, and Cognitive." (R. 807.)

respect to self-help/adaptive skills, social/emotional skills,

academic/cognitive including pre-literacy skills, and receptive and

expressive communication skills. Plaintiff was also functioning in the one to

two months range with respect to gross/fine motor skills. The First BDI

revealed that Plaintiff tended to keep his head turned to the right and

needed support to turn his head to the left. He was able to maintain head

support in pull to sitting, demonstrated increased muscle tone in both the

upper and lower extremities, and maintained open hands most of the time.

The First BDI concluded that Plaintiff was eligible for the Early Steps

program based on developmental delay due to his medical history and

increased tone in both the upper and lower extremities. (R. 398–400.)

At Plaintiff's six-month well child exam in November 2008, Plaintiff's

development included smiling, cooing, laughing, recognizing parents,

reaching for objects, transferring objects, turning his head to voice and

rolling over, standing with help, and sitting with support. (R. 219.) Then, at

his nine-month well child exam in February 2009, Ms. Starke reported that

Plaintiff was making eye contact, his speech was developing, he moved

normally, and smiled. Plaintiff could feed himself, demonstrated stranger

anxiety, waved, and could play "pat-a-cake." He demonstrated thumb-

finger grasp, could say Dada/Mama, and responded to his name. He was also able to pull to stand, stand while holding on, crawl, and sat well. (R. 220.)

A second Battelle Developmental Inventory ("Second BDI") was completed on March 31, 2009. (R. 398, 804.) The Second BDI noted a chronological age of 1 year and zero months, with an adjusted age of 9 months. (*Id.*) Plaintiff scored in the second percentile in the adaptive domain with a sum scaled score of 4.[3] (R. 804.) He could use both hands on a bottle, take strained food from a spoon, eat semisolid food when placed in his mouth, hold a bottle with both hands, and take food from a utensil. (R. 809.) Plaintiff scored in the sixteenth percentile in the personal-social domain with a sum scaled score of 14.[4] (R. 804.) He could express displeasure for certain situations, explore adult facial features, showed a desire for attention, smiled in response to attention, expressed emotions, showed awareness of his hands and feet, and responded to his name. (R. 809.) Plaintiff scored in the second percentile in the communication domain

---

[3] The "[p]ercentile [r]ank scores reflect a child's relative position within the normative sample for his or her age group." (R. 808.)

[4] The handwritten form, however, notes the fifth percentile in the personal-social domain with a sum scaled score of 10. (R. 398.)

with a sum scaled score of 9.[5] (R. 804.) Plaintiff was able to respond to a sound outside of his field of vision, turn his head toward sounds, respond to different tones, produce different cries, babble, and produce vowel sounds. (R. 809–10.)

Plaintiff scored in the third percentile in the motor domain with a sum scaled score of 9. (R. 804.) He could turn his head freely while supported in a sitting position, hold his head when pulled to a seated position, move his arms when a toy was in sight, put objects into his mouth, sit without assistance for at least five seconds, take steps when being held, crawl, pull himself to stand, hold hands open when not grasping, retrieve small objects, and transfer objects from hand to hand. (R. 810–11.) Finally, Plaintiff scored in the fourth percentile in the cognitive domain with a sum scaled score of 12.[6] (R. 804.) He could visually attend to an object for five or more seconds, follow auditory and visual stimuli, uncover a hidden toy, respond positively to physical contact, visually explore the environment, show awareness of new situations, and feel and explore objects. (R.

---

[5] The handwritten form, however, notes the third percentile in the communication domain with a sum scaled score of 9. (R. 398.)

[6] The handwritten form, however, notes the fourth percentile in the cognitive domain with a sum scaled score of 12. (R. 398.)

811–12.) Overall, Plaintiff scored in the second percentile with a sum scaled score of 49 at a 67–75% confidence interval. (R. 804.)

At Plaintiff's twelve-month well child exam in April 2009, Plaintiff received positive marks on all developmental aspects except for "1 step command with gesture." (R. 221.) He could play "pat-a-cake," wave, indicate wants, liked books, bang two objects in his hands, feed himself, say Dada/Mama, crawl, stand alone, and cruise. (*Id.*) He also received positive marks on development aspects at his fifteen-month well child exam in July 2009, despite being unable to scribble or walk well yet. (R. 512–13.) For example, he could communicate pleasure/displeasure, imitate activities, feed himself with his fingers, speak three to ten words, follow one step command with gesture, and point and gesture. (*Id.*)

Similarly, Plaintiff received positive marks in most developmental areas at his eighteen-month well child exam in October 2009. He played, showed affection, could build a tower from two cubes, scribble, point to body parts, walk backwards, run, and climb. (R. 511.) He was only able, however, to use single words and names instead of fifteen to twenty words and two word sentences. The report also noted that Plaintiff had a speech delay. (*Id.*)

In June 2010, Ms. Starke reported that Plaintiff had begun speech therapy, which was going well, and that Plaintiff had a good vocabulary, could speak over 50 words, and could speak three-word sentences. (R. 503–06.) He could imitate others, play, remove his clothes, stack blocks, point to named objects, throw and kick a ball, jump, and walk up and down stairs. (*Id.*)

Three months later, in September 2010, Marcy Hoopaugh, MA CCC/SLP, completed a speech and language evaluation for Plaintiff ("SLE 1"). His total language score was 97 in the 42nd percentile at an age equivalence of 2.2, which was within normal range for his age. His receptive skills and expressive skills were also within normal range. Using the Goldman-Fristoe testing, however, Plaintiff's score for articulation in words was 87 in the 28th percentile at an age equivalence of less than two years. The Khan-Lewis testing method further revealed excessive phonological process errors. (R. 872–74.) Ms. Hoopaugh opined that Plaintiff's articulation delay and excessive phonological process errors "decrease [Plaintiff's] ability to complete his communication message/intent and increase his frustration and behavior outbursts." (R. 873.) Accordingly,

Ms. Hoopaugh recommended Plaintiff continue speech-language therapy. (R. 874.)

Plaintiff's 30-month well child exam in November 2010 revealed positive scores in all developmental categories. (R. 494–98.) He engaged in imaginary play, played with other kids, washed and dried his hands, copied vertical lines, put on clothes, used three to four word phrases, was understandable at least 50% of the time, pointed to six body parts, knew animal sounds, jumped up and down, and threw and kicked a ball. (R. 496.)

Similarly, at his three-year well child exam in March 2011, Plaintiff also scored positive marks in all developmental categories, except for speech because Ms. Starke reported only being able to understand 50% of what Plaintiff says. Plaintiff could put on clothing, listen, engage in interactive play, built a tower of eight cubes, understood "why" and "what", name four pictures, balance on one foot, jump in place, kick a ball, and pedal a tricycle. At the time, Ms. Starke also expressed concerns about Plaintiff being very active during the day, too hyperactive, and disobedient. (R. 968–72.)

Later in March 2011, Plaintiff underwent a second speech and language evaluation with Ms. Hoopaugh ("SLE 2"). Goldman Pristoe testing revealed an age equivalence of 2.7 in the 34th percentile, which is approximately a five-month delay. Khan-Lewis testing revealed an age equivalence of 2.5 in the 34th percentile. Although an official oral motor evaluation was not completed, observations during therapy sessions showed to be within normal limits. Ms. Hoopaugh noted that his expressive/receptive language skills were previously evaluated and found to be within normal limits.

In sum, Ms. Hoopaugh opined that Plaintiff has a mild to moderate articulation delay of five to seven months. She recommended Plaintiff undergo speech therapy. Ms. Hoopaugh opined that within six months, Plaintiff would improve intelligibility of speech showing at least eight months gain, increase the number of correctly produced phonemes in initial and final position by 75%, and decrease the number of phonological process errors by 50%. (R. 867–69.)

That same month—based on Plaintiff's intervention services through the Early Steps Program—Tracey Bryant, Pre-K ESE School Psychologist with Alachua County Public Schools, evaluated Plaintiff to determine his

need for continued early intervention services in Pre-K. At the time, Plaintiff was receiving speech/language therapy from Ms. Hoopaugh and physical therapy from Kids on the Move. Ms. Starke reported the Plaintiff's early development was delayed, including walking at 16 months old and speaking his first words before one year old but only using short phrases and sentences that are difficult to understand. In addition, Ms. Starke stated that Plaintiff has asthma and sinus conditions for which he uses a nebulizer and inhaler, and frequent difficulties with constipation for which he takes Miralax. Ms. Starke reported that although Plaintiff had some seizures as a newborn, he had not had any since his birth. Plaintiff's hearing and vision were also within normal limits. Based on Ms. Bryant's evaluation and the evaluation information received from the Early Steps program, Ms. Bryant opined that Plaintiff continued to show developmental delays of more than 20% within his personal-social skills and early cognitive skills. Ms. Bryant therefore determined that Plaintiff would benefit from continued early intervention services during Pre-K. (R. 977–79.)

Accordingly, a Pre-K individualized education plan ("IEP") was developed for Plaintiff in March 2012. The IEP identified that Plaintiff had communication and language needs, and needed exceptional student

education ("ESE"), extended school year services and special transportation services. The IEP provided that Plaintiff would receive direct small group instruction for all activities, receive language therapy twice a week for thirty minutes, and spend less than 40% of his time in a separate class from non-disabled students. The IEP specifically noted that the team was concerned about Plaintiff's focus and concentration. Plaintiff's strengths, however, included being a great helper, and having good motor skills and social skills. Plaintiff liked to sing, play teacher, help the teacher, and play with his friends. (R. 988–94.)

At Plaintiff's four-year well child exam in April 2012, Ms. Starke reported concerns about Plaintiff's behavior because he could not focus on one activity for more than a few minutes. Ms. Starke advised that Plaintiff had begun playing T-ball, which he was tolerating. Upon examination, Plaintiff appeared very active around the exam room during examination but sat still for the exam and cooperated when instructed. He also displayed ankyloglossia and was unable to raise his tongue to the roof of his mouth. Nonetheless, Plaintiff received positive marks on all developmental aspects except for being able to name four colors. Plaintiff was assessed with a mild developmental delay. (R. 953–57.) After

receiving surgery in August 2012 for his ankyloglossia, Plaintiff demonstrated some improvement with his speech. (R. 898–921.)

Plaintiff returned for a follow-up evaluation at Shands Rehab with Katie J. Drane, M.A., CCC-SLP, on September 12, 2012. Ms. Drane's evaluation revealed receptive and expressive language skills below normal limits. His receptive language skills were mildly depressed and his expressive language skills were moderately depressed. Plaintiff also demonstrated a significant gap between receptive and expressive language scores characterized by greater auditory comprehension. During evaluation, Plaintiff often pointed to pictures impulsively to answer questions and then self-corrected originally missed items when provided with a longer period of time to respond. Evaluation further revealed that Plaintiff's speech intelligibility was within normal limits but that he was severely unintelligible to unfamiliar listeners in a known context during conversational speech. He displayed various speech errors, including final consonant deletions, stopping, and increased rate. He also produced both /s/ and /sh/ sounds with excess lateral airflow. Ms. Drane opined that Plaintiff's rehabilitation potential was good and that he should receive speech and language therapy one to two times per week. (R. 922–24.)

Later that month Plaintiff was also evaluated by Siraj U. Siddiqi, M.D., at the ADHD Child Development Clinic ("ADHD Clinic"). On examination Plaintiff appeared alert, active, impulsive, and could not stay seated. He was friendly and interacted well with Dr. Siddiqi. Although Plaintiff was 54 months old at the time of examination, he displayed physical abilities around 44 months, self-help abilities around 36 to 38 months, a social age of 34 months, an academic age of 38 months, and a communication age of 40 months. According to both Conners Behavior Rating Scales completed by Plaintiff's teacher and Ms. Starke, Plaintiff was hyperactive, impulsive, and poorly attentive. Dr. Siddiqi diagnosed Plaintiff with attention deficit hyperactivity disorder ("ADHD") and placed Plaintiff on Focalin XR 5 mg daily. (R. 944–45.)

When Plaintiff returned for his follow-up visit with the UF Pediatrics Department in October 2012, Ms. Starke reported that Plaintiff had been doing well. Plaintiff's physical examination was normal. Ralph Martello, MD, recommended continuing current interventions through the special pre-K program for Plaintiff's ADHD and speech delay. (R. 941–43.) Then on November 1, 2012, Plaintiff was deemed disabled via his subsequent application for disability benefits. (R. 614.)

## C.  Evidence After November 1, 2012

Plaintiff returned to the ADHD clinic for follow-up in November 2012.

Ms. Starke reported that the Focalin was improving Plaintiff's symptoms

and that he was doing fairly well academically. Although Ms. Starke

reported giving Plaintiff his medication in the afternoon and that he was still

impulsive and hyperactive in the mornings, Ms. Starke had not heard of

any significant behavior difficulties at school. Upon examination Plaintiff

was alert, active, and in a happy mood but quite impulsive and required

frequent redirection. Dr. Siddiqi opined that Plaintiff "seems to be

suboptimal in his current symptom control, as Mom has not been giving

medication as prescribed." (R. 940.) Accordingly, Dr. Siddiqi encouraged

Ms. Starke to give Plaintiff Focalin after breakfast every day. (*Id.*)

Plaintiff began Pre-K ESE classes in August 2012. In December

2012, Karen McKinley Owen completed a teacher questionnaire for

Plaintiff. Ms. Owen noted that Plaintiff had very serious problems acquiring

and using information. Although he was making good progress, he was still

below his age expectation. Plaintiff had a serious problem attending and

completing tasks on a daily basis. Ms. Owen explained that since Plaintiff

started ADHD medication, however, he had made progress. With respect

to interacting and relating with others, Ms. Owen opined that Plaintiff had a range of problems on a daily basis, from obvious to very serious. As a familiar listener, Ms. Owen could understand ½ to 2/3 of Plaintiff's speech on the first attempt. In addition, she observed that Plaintiff had a slight problem moving about and manipulating objects but had no problem caring for himself. (R. 980–87.)

Ms. Starke completed an age three to six function report for Plaintiff in January 2013. (R. 793–800.) According to her report, Plaintiff had no problems seeing or hearing. Plaintiff was allegedly totally unable to talk. At the same time, however, Plaintiff had problems talking clearly, his speech could sometimes be understood by people who knew Plaintiff well, and people who did not know Plaintiff well hardly could understand him. Plaintiff's ability to communicate was limited. He did not use complete sentences of more than four words most of the time, he struggled with expressing himself, he could not answer questions about a short read-aloud children's story or TV story like "Little Red Ridinghood," and he could not deliver simple messages such as telephone messages. He did, however, ask a lot of what, why, and where questions, talked about what he was doing, took part in conversations with other children, asked for

what he wanted, spoke about things and activities that happened in the past, and could tell a made up or familiar short story.

Ms. Starke further reported that Plaintiff's impairments limited his progress in understanding and using what he has learned. He could not recite numbers to ten, did not know his age, his birthday, or his telephone number. He did not ask what words meant, could not define common words, could not read capital letters of the alphabet, and did not understand a joke. His physical abilities were also limited. Although he could ride a tricycle, he could not catch a large ball, wind up a toy, print at least some letters, copy his first name, or use scissors fairly well. His impairments also affected his behavior with other people. Although he played "pretend" with other children, he did not enjoy being with other children nor did he show affection toward them or his parents. He did not share toys or take turns, did not play games like hide-and-seek, and did not play board games. His impairments affected his habits and ability to take care of personal needs. For example, he could not dress himself without help. He also had a limited ability to pay attention and stick with a particular task for more than fifteen minutes. Plaintiff, however, was

currently taking medication for attention deficit disorder, which enabled him to pay attention for fifteen minutes at a time. (R. 793–800.)

In September 2013, Lance Chodosh, M.D., evaluated Plaintiff and completed a childhood functional assessment for Plaintiff. Ms. Starke reported that Plaintiff's speech had improved since his tongue-tie surgery. Ms. Starke stated that Plaintiff had a decreased attention span and concentration but that he was being treated successfully with medication. Plaintiff also had poor balance and tended to fall easily. She further reported that Plaintiff could dress and undress for the most part without assistance, could walk, sit, stand, bend over at the waist, and squat. He could lift reasonable amounts of weight and his hands functioned well. His vision and hearing were normal, and although his speech was very slightly impaired, it was nonetheless improving. (R. 816–19.)

Evaluation revealed a,

[h]ealthy appearing well nourished five-year-old child of medium to large build. He is oriented, has normal speech pattern, appropriate thought content, and normal, happy affect. He is very active, but follows directions appropriately and is, overall, cooperative. His fund of knowledge seems adequate for his age. He can recite his ABCs and can count from one through twenty with one or two errors.

(R. 817.) Plaintiff's hearing and vision did not seem to be impaired. He had clear lungs and a normal breathing pattern. His heart sounds were regular, without murmur, gallop, click, or rub. Plaintiff's abdomen was normal and there was no edema, cyanosis, clubbing, deformity, or varicosity in his extremities. He demonstrated no deformity, tenderness, or paraspinal muscular spasms in his back or spine. Plaintiff's cranial nerve function was intact, his motor function was grossly normal, and he demonstrated 5/5 strength in all four extremities. Plaintiff further demonstrated good coordination, normal manual dexterity, and normal sensation. His standing balance and gait were normal. Plaintiff could perform tandem walk well, hop on one foot, and squat and rise.

Dr. Chodosh opined that Plaintiff had mild to moderate hyperactivity and atopy, including eczema, allergic rhinitis, and asthma. Dr. Chodosh further opined that "[b]ased only on objective evidence, [Plaintiff] is able to stand, walk, sit, stoop, squat, kneel, lift, carry, handle objects, see, hear, and speak normally." (R. 818.) Dr. Chodosh assessed Plaintiff with less than marked limitation in acquiring and using information, attending and completing tasks, and interacting and relating with others. (R. 814.) He

further assessed Plaintiff with no limitation in moving about and manipulating objects, self-care, and health and physical well-being. (*Id.*)

## D.  <u>Hearing Testimony</u>

Plaintiff's mother, Ms. Starke, testified at the original hearing on February 16, 2011. (R. 38.) At the time of the hearing, Plaintiff was two years old. (R. 40.) Plaintiff was born premature at 23 weeks due to an emergency C-section. (*Id.*) Ms. Starke had infection fluid around her brain and an asthma attack which caused her heart rate to go up. (*Id.*) She was not addicted to drugs or alcohol when Plaintiff was born. (*Id.*) Both Ms. Starke and Plaintiff had strokes during the procedure. (R. 40–41.)

Ms. Starke has HIV, which has progressed to AIDS. (R. 41.) Her CD4 count was very low when Plaintiff was born. (*Id.*) She was not taking any AIDS medications while she was pregnant. (R. 42.) Plaintiff has never tested positive for HIV. (*Id.*) He did, however, have hernias in his navel and testicle, resulting in removal of the navel hernia. (R. 42–43.) Plaintiff also has asthma, for which he takes Flovent twice a day. (R. 43.)

Ms. Starke thinks Plaintiff is disabled because he is different from her seven-year-old. (R. 46.) For example, Plaintiff is having an issue with potty training. (*Id.*) His speech is not as clear as other two-year-olds, he still

wants to eat with his fingers, and he does not try to dress himself. (R. 47.) Plaintiff is also very aggressive and hyper. (*Id.*) Although Plaintiff walks, he wears inserts in his shoes because he was bowlegged and his right foot was twisted more to the right. (R. 49.) When he first started walking he would fall and trip over himself. (R. 50.)

Plaintiff occasionally has asthma attacks. (R. 50.) Ms. Starke has to watch Plaintiff's breathing when he plays outside. (R. 50–51.) Plaintiff is currently in speech therapy once a week. (R. 51.)

At the supplemental hearing on January 16, 2015, Ms. Starke explained that when she prematurely delivered Plaintiff he had a heart murmur and his lungs and other things were not fully developed. (R. 559.) After birth, Plaintiff stayed in the hospital until June 2008. (R. 559–60.) After Plaintiff was released from the hospital he remained under the care of neurology, the gastroenterologist, and the infection disease doctor. (R. 560.) He was also enrolled in a program called Early Steps because of the stroke. (*Id.*) The goal was to use therapy to enable Plaintiff to use both sides of his body. (*Id.*)

Plaintiff also started ESE classes in March 2011. (R. 562–63.) He started speech language therapy when he was two years old. (R. 568.)

Plaintiff was diagnosed with ADHD on September 20, 2010. (R. 569.) He also still has a hernia in his lower abdomen. (R. 571.) The doctors, however, did not give Plaintiff any hernia-related limitations. (*Id.*) Plaintiff is not supposed to run very much because he still wears the orthotics to help with balance. (*Id.*)

## E.  Findings of the ALJ

The ALJ determined that Plaintiff was a newborn/young infant on July 28, 2008—the date the application was filed, an older infant from March 27, 2009 through March 28, 2012, and a preschooler through October 31, 2012. (R. 521.) Plaintiff did not engage in substantial gainful activity from July 28, 2008 through October 31, 2012. (*Id.*) From July 28, 2008 through October 31, 2012, Plaintiff had the following severe impairments: a history of premature birth, HIV exposure, asthma, umbilical hernia, speech and language impairment, and ADHD. (*Id.*) From July 28, 2008 through October 31, 2012, however, the ALJ concluded taht Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severeity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 522.) Plaintiff also did not have an

impairment or combination of impairments that functionally equaled the severity of the listings. (*Id.*)

In concluding that Plaintiff's impairments did not functionally equal any listing, the ALJ found that from birth through one year, Plaintiff had no limitation in acquiring and using information, no limitation in attending and completing tasks, no limitation in interacting and relating with others, less than marked limitation in moving about and manipulating objects, no limitation in the ability to care for himself, and marked limitation in health and physical well-being. (R. 529–34.) The ALJ also found that from the age when Plaintiff became an older infant—age one year through three years—Plaintiff had less than marked limitations in all six functional equivalence domains. (R. 534–40.) Finally, the ALJ found that as a preschooler—beginning March 28, 2011—Plaintiff had marked limitation in acquiring and using information, less than marked limitation in attending and completing tasks, less than marked limitation in interacting and relating with others, less than marked limitation in moving about and manipulating objects, no limitation in the ability to care for himself, and less than marked limitation in health and physical well-being. (R. 540–45.) Thus, the ALJ

concluded that Plaintiff was not disabled from July 28, 2008 through

October 31, 2012. (R. 545–46.)

## IV.  DISCUSSION

On appeal, Plaintiff raises three issues: (1) whether the ALJ erred in

failing to call a medical expert to determine the onset date of Plaintiff's

disability as required by SSR 83-20; (2) whether the ALJ erred in failing to

make credibility determinations regarding Ms. Starke's testimony; and (3)

whether the ALJ erred by failing to comply with this Court's previous

instruction to weigh the results of the Batelle Development Inventory.

## A.    Use of a Medical Expert Pursuant to SSR 83-20

Plaintiff contends that because the state agency found Plaintiff

disabled beginning November 1, 2012 in his subsequent application, the

ALJ erred by failing to call a medical expert to determine the onset date of

disability as required by Social Security Ruling ("SSR") 83-20. As

Respondent point out, however, SSR 83-20 has no application to this case.

Thus, the ALJ was not required to call a medical expert to determine the

onset date.

Social Security Ruling 83-20 provides guidance on establishing the

onset date of disability. 1983 WL 31249, at *1 (1983). Social Security 83-

20, however, does not mandate use of a medical expert in all cases. *See*

*id.* Instead,

> [t]here are two situations where the ruling suggests the need
> for the ALJ to call medical advisor during a hearing: (1) where it
> may be possible, based on medical evidence, to "reasonably
> infer that the onset of a disabling impairment(s) occurred some
> time prior to the date of the first recorded medical examination";
> and (2) in terms of a malignant neoplastic disease, "to establish
> the onset of disability prior to the time a malignancy is first
> demonstrated to be inoperable or beyond control by other
> modes of therapy."

*Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772, 776 (11th Cir. 2010)

(quoting SSR 83-20). Accordingly, SSR 83-20 only requires an ALJ to

obtain medical expert testimony in certain instances to determine a

disability onset date *after* a finding of disability. *See Caces v. Comm'r, Soc.*

*Sec. Admin.*, 560 F. App'x 936, 939 (11th Cir. 2014) (holding that because

the ALJ did not find plaintiff disabled and substantial evidence supported

that determination, the ALJ was not required to call a medical advisor to

determine the date of onset); *Klawinski*, 391 F. App'x at 776 (concluding

that the ALJ did not contravene SSR 83-20 by not calling a medical expert

because the ALJ ultimately found plaintiff not disabled).

In this case, the ALJ was not required to call a medical expert to

determine an onset date. The ALJ found that Plaintiff was not disabled at

any time during the relevant period—from July 28, 2008 through October

31, 2012. Accordingly, SSR 83-20 does not apply to this case.

      Furthermore, Plaintiff's reliance on the state agency's subsequent

disability determination is irrelevant to the instant determination. As the

Eleventh Circuit has explained,

> there is no inconsistency in finding that two successive ALJ
> decisions are supported by substantial evidence even when
> those decisions reach opposing conclusions. Faced with the
> same record, different ALJs could disagree with one another
> based on their respective credibility determinations and how
> each weighs the evidence. Both decisions could nonetheless
> be supported by evidence that reasonable minds would accept
> as adequate. Because of that possibility, the mere existence of
> a later favorable decision by one ALJ does not undermine the
> validity of another ALJ's earlier unfavorable decision or the
> factfindings upon which it was premised.

*Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 821–22 (11th Cir.

2015) (citing *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 653 (6th Cir.

2009) (declining to remand plaintiff's first application even though

subsequent application found plaintiff disabled one day after first ALJ found

plaintiff not disabled); *see also Douglas ex rel. Patterson v. Comm'r of Soc.

Sec.*, No. 04-16235, 2005 WL 3116634, at *1 (11th Cir. Nov. 23, 2005)

(explaining that a subsequent award of benefits was irrelevant and instead

merely indicated that plaintiff's condition deteriorated after the ALJ's decision).

Notably, the state agency's subsequent disability determination was based on a state agency medical consultant's finding that Plaintiff had marked limitations in two domains of functioning: (1) attending and completing tasks;[7] and (2) interacting and relating with others.[8] (R. 623.) In this case, however, Plaintiff asserted that he met three different domains of functioning. During the administrative hearing on remand in this case Plaintiff asserted that he met the functional limitations from July 2008 to October 2012 because he had marked limitations in three domains of functioning: (1) moving about and manipulation of objects; (2) acquiring and using information; and (3) health and well-being. (R. 573–74.) Notably, Plaintiff conceded that during the period from July 2008 to October 2012, Plaintiff had *less than marked* limitations with respect to the other two domains of functioning: (1) attending and completing tasks; and

_____

[7] The consultant noted, "child is on medication for ADHD with minimal improvement[.] [T]eacher reports some improvement but overall problems continue in all areas[.] [T]his is consistent with MER serious problems noted." (R. 623.)

[8] The consultant explained, "both parent and teacher indicate limitations in social interactions[.] [M]oderate to serious problems noted in social skills with severe problems in social language skills[.] [H]as problems making friends[,] does not follow rules[,] [and is] on a behavior management plan in Pre-k ese class[.]" (R. 623.)

(2) interacting and relating with others. (R. 574.) Thus, Plaintiff's second application—premised on marked limitations in two specific domains of functioning—does not undermine the ALJ's unfavorable decision where Plaintiff concedes that he had *less than marked* limitations in those same domains from July 2008 through October 2012.

In sum, neither Plaintiff's subsequent application nor SSR 83-20 demonstrate that the ALJ erred in this case.[9]  Accordingly, the Court concludes that the ALJ's failure to call a medical expert in this case does not warrant reversal.

## B.   Credibility Determination

Plaintiff also argues that the ALJ erred by failing "to make any credibility determination whatsoever regarding the testimony of the claimant's mother, Dantrille Starke." (ECF No. 20 at 28.) Plaintiff says that because the ALJ did not make an explicit credibility determination, this Court must infer that the ALJ found Ms. Starke to be lacking in credibility,

---

[9] Plaintiff does not argue that the ALJ's decision is not supported by substantial evidence, nor does he raise a specific challenge regarding any of the six domains of functioning. The Court therefore declines to consider those issues. *See Sanchez v. Comm'r of Soc. Sec.*, 507 F. App'x 855, 856 n.1 (11th Cir. 2013) (noting that plaintiff waived particular arguments by not expressly challenging the ALJ's findings).

which Plaintiff says is inappropriate pursuant to *Tieniber v. Heckler*, 720

F2d 1251, 1255 (11th Cir. 1983).

Where a claimant attempts to establish disability based in part on

subjective statements of symptoms, the claimant must first produce (1)

evidence of an underlying medical condition, and (2) objective medical

evidence either (a) confirming the severity of the alleged symptoms or (b)

indicating the medical condition could reasonably be expected to cause the

symptoms alleged. 20 C.F.R. § 416.929; *Wilson v. Barnhart*, 284 F.3d

1219, 1225 (11th Cir. 2002). When the medical evidence shows the

claimant has a medically determinable impairment that could reasonably

be expected to produce the claimant's symptoms, the ALJ must then

determine the extent to which the intensity and persistence of symptoms

limit the child claimant's functioning. § 416.929(c)(1). In evaluating the

intensity and persistence of a claimant's symptoms the ALJ considers all of

the available evidence, including the claimant's medical history, the

medical signs and laboratory findings, and statements about how the

claimant's symptoms affect him. *Id.*

If a child under the age of 18 is unable to adequately describe his

symptoms, the person who is most familiar with the child, such as a parent,

other relative, or guardian may describe the child's symptoms. 20 C.F.R. §

416.928(a). If the ALJ decides not to credit the claimant's testimony as to

his subjective symptoms, the ALJ must articulate explicit and adequate

reasons for doing so, or the record must be obvious as to the credibility

finding. *See Foote*, 67 F.3d at 1561–62.  But, "where proof of disability is

based upon subjective evidence and a credibility determination is,

therefore, a critical factor in the [Commissioner's] decision, the ALJ must

either explicitly discredit such testimony or the implication must be so clear

as to amount to a specific credibility finding." *Tieniber*, 720 F.2d at 1255.

While the ALJ does not have to cite particular phrases or

formulations, broad findings that a claimant was incredible and not

disabled, alone, are insufficient for the Court to conclude that the ALJ

considered the claimant's medical condition as a whole. *Id*. at 1562. The

ALJ's articulated reasons must also be supported by substantial evidence.

*Jones v. Dep't of Health & Human Servs*., 941 F.2d 1529, 1532 (11th Cir.

1991). The Court will not disturb a properly articulated credibility finding

that is supported by substantial evidence. *Foote*, 67 F.3d at 1562.

In evaluating credibility, the Commissioner considers the objective

medical evidence and the following factors:

> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96–7p, 1996 WL 374186, at *3 (July 2, 1996) (superseded by SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016) (listing same factors)); § 416.929(c)(3).

Here, the ALJ explicitly articulated his credibility finding regarding Ms. Starke's testimony. The ALJ wrote: "After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; *however, the statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained below*." (R. 523) (emphasis added). Thus, Plaintiff's argument that "this Court would have to infer that the ALJ found Ms. Starke to be lacking in credibility

solely from the ALJ's ultimate conclusions," (ECF No. 20 at 29), is wholly without merit. After making the credibility determination, the ALJ discussed his reasons and the substantial evidence supporting the determination. These reasons include the following.

First, the ALJ pointed to Ms. Starke's inconsistent statements. *See Leiter v. Comm'r of Soc. Sec. Admin.*, 377 F. App'x 944, 948 (11th Cir. 2010) (inconsistencies between subjective testimony, daily activities, and medical evidence supported adverse credibility finding). During the administrative hearing on remand, Ms. Starke testified that Dr. Ralph Montello told Plaintiff he could not run too much because of his orthotic inserts and balance problems. (R. 571.) The ALJ noted, however, that none of the medical records from Plaintiff's treating physicians suggested that Plaintiff's ability to run was limited. (R. 523.) To the contrary, the record reveals that by June 2009, Plaintiff was walking and running. (R. 512.) By February 2010, Plaintiff could go up and down stairs, run on level surfaces, walk backwards, elevate on his toes, reach overhead, and kick a ball. (R. 928, 930.)  And by March 2011, he could balance on one foot and jump in place. (R. 971.) Nothing suggests that Plaintiff was unable to run,

nor does the record suggest that Plaintiff's balance issues were severe or functionally limited him in any respect.

The ALJ also relied upon the fact that there was evidence Ms. Starke had not been entirely complaint in administering Plaintiff the prescribed medications, "which suggests that the symptoms may not have been as limiting as the claimant has alleged in connection with this application." (*Id.*); *see* SSR 96-7p, at *3 (in evaluating credibility, the ALJ considers the medications the claimant takes to alleviate pain and other symptoms).

For example, in June 2010, despite being instructed to use the mask/aerochamber Flovent, Ms. Starke admitted that she had been using it without the chamber. (R. 503–06.) Then in October 2010, Ms. Starke admitted she was still giving Plaintiff Flovent without a spacer. (R. 499–500.) Notably, five days later, Plaintiff presented to the emergency department for difficulty breathing. (R. 463–72.)

Similarly, in November 2012, less than two months after Dr. Siddiqi prescribed ADHD medication and instructed Ms. Starke to give the medication to Plaintiff in the mornings after breakfast, Ms. Starke reported that Plaintiff was still impulsive and hyperactive in the mornings. (R. 940.) At the same time, however, Ms. Starke admitting giving Plaintiff his

medication in the afternoon despite being instructed to provide it in the mornings. (*Id.*)

The ALJ further pointed out that records dislcosed Plaintiff's physical therapy case was closed in May 2010 due to lack of response from Ms. Starke. *See* SSR 96-7p, at *3 (the ALJ considers treatment, other than medication, that the claimant receives when evaluating credibility). Only six months after beginning physical therapy and using orthotics, Plaintiff grew out of the orthotics and needed new ones. (R. 926, 928, 933.) Approximately three months then passed, during which time Kids on the Move made repeat attempts to deliver the new orthotics. Ms. Starke did not respond, however, so Plaintiff was discontinued from the program in May 2010. (R. 933.) Notably, Plaintiff had to return to Kids on the Move approximately two years later for continued problems. (R. 929–31.)

The ALJ also pointed to opinion evidence in support of the credibility determination. *See* § 416.929(c)(1) (explaining that in evaluating the intensity and persistence of a claimant's symptoms, the Commissioner considers all of the available evidence, including the "medical opinions of your treating source and other medical opinions"). The ALJ gave great weight to Ms. Drane's September 2012 evaluation, and assigned less than

marked limitations in interacting and relating with others as a preschooler. Ms. Drane opined that Plaintiff's receptive language skills were mildly depressed and his expressive language skills were moderately depressed. And although Plaintiff displayed various speech errors and was severely unintelligble to unfamiliar listeners, Ms. Drane opined that Plaintiff's rehabilitation potential was good. (R. 922–24.)

Finally, the ALJ expressly discussed and relied upon the objective medical evidence to support his credibility determination. *See Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole.'"). The ALJ clearly discussed the medical evidence supporting her limitation conclusion separately under each domain of functioning and each age range.

With respect to acquiring and using information, from birth to one year, the ALJ noted that Plaintiff passed a newborn hearing test, was alert, laughed when others talked to him, and appeared to enjoy looking at an adult. (R. 219–20, 232.) By February 2009, Plaintiff was beginning to speak

and respond to his name. (R. 220.) As an older infant, the Second BDI disclosed Plaintiff was able to express displeasure or dislike of certain situations, respond to voices, and vocalize his feelings. (R. 809–10.) By September 2009, Plaintiff could follow one-step commands. (R. 512–13.) In September 2010, Ms. Starke reported that Plaintiff responded well at home. (R. 474.) By June 2010, Plaintiff could point to named objects and use two-word phrases. (R. 503–06.)

In the attending and completing task domain, from birth to one year, the ALJ noted that Plaintiff was able to focus briefly on faces. (R. 124.) By February 2009, Plaintiff could play "pat-a-cake." (R. 220.) As an older infant, records evidence that Plaintiff engaged in imaginary play and interactive games. (R. 496, 970.) As a preschooler, in April 2012 despite being very active, Plaintiff was able to sit still for an exam and cooperated when instructed. (R. 955.) The ALJ further discussed how Plaintiff's attention began decreasing and that he was eventually placed on ADHD medication, but also noted that there is evidence that Ms. Starke was not providing the medication as instructed.

With respect to interacting and relating with others, from birth to one year, Ms. Starke reported no problems with Plaintiff's sight or hearing. (R.

123–24.) Plaintiff could smile and coo when others talked to him. Plaintiff

appeared to enjoy looking at adults. (R. 124.) By February 2009, Plaintiff

demonstrated stranger anxiety, could wave, and responded to his name.

(R. 220.) As an older infant, the Second BDI showed Plaintiff demonstrated

a desire for social attention and smiled in response to adult attention. (R.

809.) Plaintiff could express emotions and responded to his name. (*Id.*) He

could say several words by late 2009. (R. 511–13.) By June 2010 Plaintiff

could imitate others, use two-word phrases, and speak 50 words. (R.

503–06.) As a preschooler, in March 2012, records evidence that Plaintiff

demonstrated good social skills and played with others. (R. 988–94.)

     In the moving about and manipulating objects domain, from birth to

one year, Plaintiff could roll over and lift himself up, bear some weight on

his legs, grasp a finger, could maintain head support, and demonstrated

increased muscle tone in the extremities. (R. 122–26, 398–400.) By

February 2009 he could feed himself, pull to a stand, crawl, and sit. (R.

220.) As an older infant, the Second BDI showed that Plaintiff could hold a

bottle, eat from a utensil held by an adult, and put objects into his mouth.

(R. 809.) At his 12-month well child exam, Plaintiff could bang two objects

in his hands, feed himself, crawl, stand alone, and cruise. (R. 221.) By

September 2009 Plaintiff could walk backwards, and stack blocks. (R. 511.) In June 2010 he could use a spoon and fork, throw or kick a ball, and go up or down stairs. (R. 503–06.) By March 2011, Plaintiff could balance on one foot, jump in place, kick a ball, and pedal a tricycle. (R. 971.) As a preschooler, Plaintiff started playing T-ball and his IEP noted that his motor skills were a strength. (R. 954, 988.)

With respect to caring for oneself, from birth to one year, the ALJ noted that Plaintiff was not expected to care for himself. Nonetheless, by February 2009 he was able to feed himself. (R. 220.) As an older infant, records demonstrate that by late 2010, Plaintiff could remove his clothes, put on his clothes, use utensils, and wash and dry his hands. (R. 496, 504.)

Finally, in the health and physical well-being domain, as an older infant, records disclose that there was no sign of HIV infection and his cholestasis had resolved. (R. 843.) In June 2010, Ms. Starke reported that Plaintiff had not needed Albuterol for several weeks. (R. 503.) In July 2010, the only medications Plaintiff was taking were Flovent and loratidine. (R. 450.) And as a preschooler, in late 2012 Plaintiff was healthy and doing well. (R. 942.)

The ALJ's reasons supporting her credibility finding are abundantly

clear and supported by specifically identified substantial evidence. *Cf.*

*Snyder v. Comm'r of Soc. Sec.*, 330 F. App'x 843, 848 (11th Cir. 2009)

(ALJ erred in making broad credibility finding that plaintiff's statements

were not entirely credible without pointing to any objective medical

evidence or any other evidence); *Tauber v. Barnhart*, 438 F. Supp. 2d

1366, 1378–80 (N.D. Ga. 2006) (concluding that the ALJ's credibility

determination was deficient where the ALJ failed to present reasons that

he discredited plaintiff's testimony). Although Plaintiff relies on *Tieniber* for

his assertion that the ALJ erred regarding her credibility finding, Plaintiff's

reliance on *Tieniber* is both unavailing and misplaced.

In *Tieniber*, "the insufficiency of the ALJ's reasons for rejecting the

subjective evidence [was] particularly crucial" because the claimant's

testimony and the claimant's daughter's testimony was the only direct

evidence produced from the alleged disabling period. 720 F.2d at 1254. In

this case, however, Ms. Starke's testimony was not the only direct

evidence produced from the alleged disabling period. The record contains

hundreds of pages of medical records, school records, and opinion

evidence, all of which the ALJ incorporated into his decision. Ms. Starke's

testimony was, therefore, not crucial like the claimant's testimony was in *Tieniber*. Moreover, even if Ms. Starke's testimony had been crucial, the ALJ still would not have committed reversible error because he did not fail to make a credibility determination. *See Taylor v. Comm'r of Soc. Sec. Admin.*, 213 F. App'x 778, 780 (11th Cir. 2006) (ALJ did not commit reversible error by failing to make credibility determination because claimant mother's testimony was not the only evidence from the alleged disabling period—ALJ also considered other evidence, including medical records, school records, and claimant's own testimony).

In sum, the ALJ's finding that Ms. Starke's statements concerning the limiting effects of Plaintiff's impairments were not entirely credible is supported by explicit and articulated reasons. Moreover, substantial evidence supports the ALJ's finding. There is no reason to disturb the ALJ's well articulated findings regarding Ms. Starke's credibility.

## C.  Standardized Test Scores

Finally, Plaintiff argues that the ALJ committed reversible error by failing to comply with this Court's previous order to weigh the results of the BDIs. Plaintiff says that although the ALJ referenced the BDIs and the

weight she gave to the physical portion, the ALJ failed to discuss the mental results of the test or assign any weight to the mental portion.

As previously outlined, the Social Security regulations consider a child disabled if the child has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." § 1382c(a)(3)(C)(I) (2015). A marked limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." § 416.926a(e)(2)(I). The child's day-to-day functioning in domain-related activities, however, must be consistent with that score. § 416.926a(e)(2)(iii). In addition, the Commissioner "will not rely on any test score alone," because "[n]o single piece of information taken in isolation can establish whether [the claimant has] a 'marked' . . . limitation in a domain." § 416.926a(e)(4)(I). Social Security regulations ensure, however, that "if there is a material inconsistency between your test scores and other information in your case record, we will try to resolve it" and that if "we do

not rely on test scores, we will explain our reasons for doing so in your case record or in our decision." § 419.926a(e)(4)(iii).

Unlike the ALJ's decision after the first hearing—which completely failed to mention or assign any weight to the BDI results (R. 14–26)— the ALJ on remand after the second hearing explicitly discussed the test results and assigned weight to each test. Specifically, the ALJ discussed the First BDI, which concluded that Plaintiff's "corrected age was 2 months and 20 days and he was functioning within the 1–2 month range of development." (R. 524.) The ALJ "gave limited weight to this assessment because although it is consistent with the physical exam findings or other treating sources, the evaluation is unsigned and it is unclear how an increased tone in the extremities constituted a delay." (*Id.*)

The ALJ also discussed the Second BDI at great length. (R. 527–28.) The ALJ summarized test objectives on the Second BDI that Plaintiff could not perform at all as of March 31, 2009,[10] and noted that Plaintiff's raw

---

[10] These summarized items included the following: Finger feeding, drinking from a cup, chewing food from side to side, discriminating between familiar and unfamiliar people, showing appropriate signs of separation anxiety, vocalizing when imitated, waving bye-bye, imitating speech sounds, using gestures to indicate wants or needs, showing signs of emerging fine or gross motor skills, showing signs of ability to occupy himself for five minutes, or attending to a game of peek-a-boo for one minute. (R. 528.)

score was 140. (R. 528.) Based on Plaintiff's assertion that the Adaptive domain and the Communication and Motor domain in the BDI are comparable to the domains used by Social Security, the ALJ specifically discussed the findings in the Second BDI regarding those two domains. The ALJ noted that the Second BDI found Plaintiff scored below the 5th percentile in these two domains. The ALJ further explained that she found counsel's argument unpersuasive that these scores would be the equivalent of two deviation points below the standard.

Specifically, the Second BDI was a checklist-type document that did not include any narrative explaining the results. Although the report included a section explaining how the test was performed, the section was not completed. (R. 806.) Appropriately, the ALJ found it difficult to determine the information upon which the BDI examiner based the conclusions. The ALJ explained that this weakened the reliability and validity of the report.

The ALJ further determined that "[e]vidence in the record supports a conclusion that the claimant was functioning at a higher level than that which is suggested by these test scores, regardless of any [of] the reliability concerns mentioned above." (R. 528.) She also relied upon the

fact that the Second BDI was performed shortly after Plaintiff's first

birthday, despite the fact that the age range for purposes of social security

is one to three years old. *See* § 416.926a(g)(2)(ii) (defining the older infant

and toddler age group as from age one to attainment of age three). The

ALJ pointed out that Plaintiff's functioning "progressed significantly" from

age one to age three.

Accordingly, the ALJ gave little weight to the Second BDI, "as there

[wa]s no rationale to support a conclusion that the claimant had marked

limitations of functioning." (*Id.*) Not only was there no documentation as to

how Plaintiff's performance in these domains was determined, other

evidence in the record conflicted with the report's findings. For example,

despite the report's finding that Plaintiff could not attend to a game of

peek-a-boo for one minute, in August 2008, Ms. Starke reported that

Plaintiff played games like peek-a-boo. (R. 124.)

The ALJ also specifically discussed the Second BDI when evaluating

certain domains of Plaintiff's functioning as an older infant: (1) acquiring

and using information; (2) interacting and relating with others; (3) moving

about and manipulating objects; and (4) ability to care for oneself. (R.

535–39.) In assigning Plaintiff a less than marked limitation in acquiring

and using information as an older infant, the ALJ pointed out that in March 2009, according to the Second BDI, Plaintiff was able to express displeasure of dislike of certain situations and explore adult features, respond to both voices and nonspeech sounds outside of his field of vision, vocalize to express his feelings, produce one or more single-syllable consonant-vowel sounds, demonstrate that he could visually explore the environment, show awareness of new situations, and feel and explore new objects. (R. 535.)

Similarly, in assigning Plaintiff a less than marked limitation in interacting and relating with others as an older infant, the ALJ pointed to the results in the Second BDI that in March 2009 Plaintiff demonstrated a desire for social attention, smiled in response to adult attention, could express his emotions, and responded to his name. (R. 537.)

Likewise, with respect to assigning less than marked limitation in moving about and manipulating objects as an older infant, the ALJ noted that the Second BDI showed Plaintiff was aware of his hands and feet, could hold a bottle to feed himself, eat semi-solid food, eat from a utensil held by an adult, turn his head freely from side to side while supported in a sitting position, put objects into his mouth, turn from a prone to supine

position unassisted, sit without assistance for at least five seconds, and obtain a nearby object. (R. 538.)

And with regard to assigning less than marked limitation in the ability to care for oneself as an older infant, the ALJ cited the Second BDI's findings that Plaintiff was able to express his feelings, take strained food from a spoon and swallow it, eat semisolid food when put in his mouth, and hold a bottle to feed himself. (R. 539.)

The ALJ's explicit reliance on these portions of the Second BDI wholly refute Plaintiff's contention that the ALJ failed to consider the mental portions of the Second BDI. The BDI describes the Cognitive domain as that which "measures those skills and abilities most commonly thought of as 'mental' or 'intellectual', except for language and communication skills. The Cognitive milestones involve activities such as attending to, perceiving and processing information; remembering; thinking; and knowing." (R. 812.) The BDI further describes the Communication domain as that which "measures how effectively a child receives and expresses information, thoughts, and ideas through verbal and nonverbal means." (*Id.*) The ALJ expressly noted the Second BDI's Cognitive domain findings that Plaintiff responded to both voices and nonspeech sounds outside of his field of

vision, vocalized to express his feelings, and produced one or more single-syllable consonant-vowel sounds. (R. 535, 809–10.) Similarly, the ALJ expressly noted the Second BDI's Communication domain findings that Plaintiff demonstrated he could visually explore the environment, showed awareness of new situations, and felt and explored new objects. (*Id.*)

Although Plaintiff's scores in the Adaptive and Communication domains were essentially the equivalent of two standard deviations below the mean, (R. 808),[11] the Social Security regulations provide that the Commissioner may find that the claimant does not have a "marked" limitation, even if his test scores are at least two but less than three standard deviations below the mean if other information in the record shows that the claimant's functioning in day-to-day activities is not seriously limited by his impairments. § 416.926a(e)(4)(ii)(B). The ALJ specifically noted that other substantial evidence in the record, such as Ms. Starke's function report, conflicts with the report's Adaptive and

---

[11] The BDI's comprehensive report provides a "Z-Score" for each domain. (R. 808.) The "Z-Score is an often reported type of standard score which has a mean of 0 and a standard deviation of 1. This score reflects the number of standard deviations an individual falls above or below the average for the group. A Z-Score of -1 typically falls at the 16th percentile, a zero at the 50th, and a 1 at the 84th percentile." (*Id.*)

Communication domain findings. As the ALJ pointed out, although the

Second BDI—completed in March 2009—concluded that Plaintiff did not

wave bye-bye, imitate speech sounds, or attend to a game of peek-a-boo

for a minute, Ms. Starke reported in August 2008 that Plaintiff made cooing

sounds and liked to play peek-a-boo. (R. 124.)

Similarly, Plaintiff's six-month well child exam in February 2009

disclosed that Plaintiff could wave and say Dada/Mama. (R. 220.) In

addition, although the Second BDI concluded that Plaintiff could not use

gestures to indicate his wants or needs, or look at, point to, or touch

pictures in a book, Plaintiff's twelve-month well child exam in April

2009—only a month after the Second BDI was completed—evidenced that

Plaintiff could play pat-a-cake, wave, indicate his wants, liked books, and

say Dada/Mama. (R. 221.) Thus, while the Second BDI may have placed

Plaintiff with marked limitations in these areas, other information in the

record demonstrated that Plaintiff's functioning was not as limited as the

Second BDI suggested.

The ALJ's decision here is stands in stark contrast to the ALJ's

decision after the first hearing. Whereas there was no mention of the BDIs

in the first decision, the ALJ's decision here explained in significant detail

the results and her reasons for assigning the results the weights that she did.

Finally, to the extent Plaintiff argues the ALJ failed to assign weight to the mental portions of the tests, the Court disagrees. Nothing in the ALJ's opinion suggests that the weights assigned were only with respect to the physical portions of the test. Moreover, as discussed in detail above, the ALJ's evaluation of the evidence took into consideration the mental portions of the tests.

In sum, Plaintiff has failed to demonstrate that the ALJ committed reversible error with respect to the standardized test scores. Accordingly, the Commissioner's decision is due to be affirmed.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**DONE AND ORDERED** this 21st day of November, 2016.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**